# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ESTATE OF JOAO AZEVEDO and AMANDA AZEVEDO, | : : : | |
| | : | Civil No. 3:08-cv-1075 (SRU) |
| Plaintiffs, | : : | |
| vs. | : : | |
| DANBURY INSURANCE COMPANY, | : : | |
| Defendant. | : : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : : | |
| DANBURY INSURANCE COMPANY, | : : | |
| Counterclaim and Crossclaim Plaintiff, | : : : | |
| vs. | : : | |
| ESTATE OF JOAO AZEVEDO and AMANDA AZEVEDO, | : : : | |
| Counterclaim and Crossclaim Defendants. | : : | October 5, 2012 |

## MEMORANDUM OF LAW IN SUPPORT OF DANBURY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted by:

Paul D. Williams (ct05244)
Joseph K. Scully (ct26541)
Thomas O. Farrish (ct26917)
Day Pitney LLP
242 Trumbull St.
Hartford, Connecticut 06103-1212
(860) 275-0100 (tel.)
(860) 275-0343 (fax)

Its Attorneys

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND .................................................................6

III.  DISCUSSION ........................................................................................6

      A.   The Summary Judgment Standard .............................................6

      B.   There Is No Issue of Material Fact to be Tried:  The Azevedos Obtained
           Their Insurance Policy Through Material Misrepresentation, and Their
           Material Misrepresentations Void the Policy .......................................7

           1.   The Azevedos Made Untrue Statements In Their Application .................8

           2.   The Azevedos Made Their Untrue Statements Knowingly .....................10

           3.   The Azevedos' Untrue Statements Were Material to Danbury's
                Decision to Insure .................................................................12

           4.   All of the Azevedos' Anticipated Defenses Lack Merit ..........................14

      C.   Danbury's Misrepresentation Defense Disposes Not Only of the
           Azevedos' Contract Breach Claims, but Also of Their Bad Faith and
           CUTPA/CUIPA Claims ...........................................................17

IV.   CONCLUSION ...................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

*Cases*

*Basso v. Potter*, 596 F. Supp. 2d 324 (D. Conn. 2009) ……………………………..     7

*Carford v. Empire Fire & Mar. Ins. Co.,* 94 Conn. App. 41, 891 A.2d 55 (2006) …….     2, 19

*Danbury Ins. Co. v. Ginnetti*, No. 3:02-cv-02097 (RNC), 2004 U.S. Dist. LEXIS 17857 (D. Conn. Aug. 5, 2004) …………………………………………………..     2, 16

*Mt. Airy Ins. Co. v. Millstein*, 928 F. Supp. 171 (D. Conn. 1996) …………………..     10

*Pinette v. Assur. Co. of Am.*, 52 F.3d 407 (2d Cir. 1995) ……………………………..     Passim

*Paul Revere Life Ins. Co. v. Pastena*, 52 Conn. App. 318, 725 A.2d 996 (1999) ……..     10

*Ranger Ins. Co. v. Kovach*, 63 F. Supp. 2d 174 (D. Conn. 1999) ……………………..     2, 13

*Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.,* 281 Conn. 227, 915 A.2d 290 (2007) ……………………………………………………………………………..     18

*Royal Indem. Co. v. King,* 532 F. Supp. 2d 404 (D. Conn. 2008) …………………….     18 – 19

*State Bank & Trust Co. v. Conn. Gen. Life Ins. Co.,* 109 Conn. 67, 145 A. 565 (1929) …………………………………………………………………………………..     1, 7

*Stonington Water St. Assocs., LLC v. Hodess Bldg. Co.*, 792 F. Supp. 2d 253 (D. Conn. 2011) ………………………………………………………………………….     6, 7

*United Techs. Corp. v. Am. Home Assur. Co.,* 118 F. Supp. 2d 181 (D. Conn. 2000) ...     18

*Rules*

Fed. R. Civ. P. 56(a) ……………………………………………………………………     6

Fed. R. Evid. 1003 ……………………………………………………………………..     17

Fed. R. Evid. 1004 ……………………………………………………………………..     17

*Other Authorities*

Wright, Miller & Kane, *Fed. Prac. & Proc.: Civil 3d* § 2734 ……………………………     7

## I.    Introduction

Pursuant to Local Rule 56(a)4, defendant Danbury Insurance Company ("Danbury") respectfully submits this memorandum of law in support of its motion seeking an order (a) granting summary judgment in Danbury's favor on its third affirmative defense and (b) dismissing all of the claims in the fourth amended complaint of the plaintiffs Amanda Azevedo and the Estate of Joao Azevedo.

As the Court is aware, this case has been pending for nearly five years. During that time the parties have contended over a number of issues, including the legal sufficiency of the plaintiffs' "bad faith" pleading and their claim of entitlement to a prejudgment remedy, just to name a few disputes. The parties litigated a *Daubert* motion when the plaintiffs unsuccessfully moved to preclude the testimony of an expert witness who opined that the fire in their home was intentionally set. (ECF No. 142.) Perhaps most memorably, Danbury was constrained to seek disqualification of plaintiffs' counsel on two separate occasions. (ECF Nos. 162, 194.) In short, this has been an uncommonly contentious case.

Yet all of this contention cannot obscure one simple fact: this is a straightforward misrepresentation case that is easily resolved on summary judgment. For nearly a hundred years, it has been the law in Connecticut that when an insurance applicant lies on a matter of material interest to the insurer, the insurance policy is void and the insurer is absolved of any duty to pay the applicant's claims. *State Bank & Trust Co. v. Conn. Gen. Life Ins. Co.,* 109 Conn. 67, 72, 145 A. 565 (1929); *Pinette v. Assur. Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 1995). The Azevedos lied on their insurance application. They lied when they said that they had no wood stove in their home, and they lied when they said that they had no underground oil storage tank in their yard, among other untruths. Moreover, there is no issue of fact to be tried on these points,

because the Azevedos admitted them in their depositions and examinations under oath. Additionally, there is no dispute whatsoever that their misrepresentations were material to Danbury's decision to issue their policy. Danbury simply does not insure homes with wood stoves and underground oil storage tanks.

If the Azevedos had told the truth when filling out their application, Danbury would have declined to insure them – and would not have been their insurer when their house later burned. Courts in this District have not been reluctant to grant summary judgment to the insurer under similar circumstances. *E.g., Ranger Ins. Co. v. Kovach*, 63 F. Supp. 2d 173 (D. Conn. 1999); *Danbury Ins. Co. v. Ginnetti*, No. 3:02-cv-02097 (RNC), 2004 U.S. Dist. LEXIS 17857 (D. Conn. Aug. 5, 2004). This court should likewise grant summary judgment in Danbury's favor on its third affirmative defense, and dismiss the contract breach counts in the plaintiffs' fourth amended complaint.

The court should also dismiss the Azevedos' claims of "bad faith" and violations of the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act – "CUTPA" and "CUIPA," respectively. Causes of action for "bad faith" and CUTPA/CUIPA violations are available only to insurance policyholders; they are unavailable to persons who lack a contractual relationship with the insurer. *See Carford v. Empire Fire & Mar. Ins. Co.,* 94 Conn. App. 41, 45, 891 A.2d 55 (2006). Because the Azevedos obtained their policy through material misrepresentation, their policy is void *ab initio*. In other words, it is to be treated as if it never existed – and the Azevedos are to be treated as if they were never Danbury policyholders. Since they never had a valid contractual relationship with Danbury, they cannot maintain causes of action for "bad faith" and CUTPA/CUIPA violations. Those counts should be dismissed along with the contract breach counts.

## II.    Factual Background

Joao and Amanda Azevedo got married in 2001 and purchased their first home in 2003. (Tr. of Depo. of J. Azevedo, at 28, 30.)[1] They did not stay in that home long, however. In 2004 they sold the home, using the equity to support Mr. Azevedo's wood flooring business and to lease a luxury SUV. (*Id.* at 37 – 40.) They bought another house in Trumbull for $330,000, putting less than five percent down. (*Id.* at 37 – 38.)

They did not stay in their second home long either. In 2006 they sold their Trumbull house for $360,000 and traded up to a $630,000 home at 62 Hunter Ridge Road in Monroe. (*Id.* at 42 – 44.) They used $20,000 of the equity in the Trumbull home to pay a portion of the business debts that Mr. Azevedo had accumulated in the intervening two years. (*Id.* at 44.) In contrast to the Trumbull home, on which they put five percent down, the Azevedos put nothing down on the more expensive Monroe home. (*Id.* at 43.)

The broker who arranged the mortgage on the Monroe property referred them to the Adam Miller insurance agency to obtain homeowners insurance. (Tr. of Depo. of M. Krasner, at 19.)[2] An Adam Miller employee by the name of Michael Krasner called them to take their application over the phone. (*Id.* at 18, 28.) Using a "Danbury Insurance Company Homeowners Application" form as his guide, Mr. Krasner asked the Azevedos whether their new home had an outside oil tank, and they responded "no." (*Id.* at 34, 36, 37.) He also asked them whether the

---

[1]    All of the pages of the transcript of Joao Azevedo's deposition that are cited in this memorandum are included in Exhibit 1 to the attached Affidavit of Thomas O. Farrish.

[2]    All of the pages of the transcript of Michael Krasner's deposition that are cited in this memorandum are included in Exhibit 2 to the Farrish Affidavit.

home had a wood stove, and they responded "no" to that question as well. (*Id.* at 37.) Additionally, he asked them whether they had pets, and they denied owning any. (*Id.*)[3]

Mr. Krasner asked the Azevedos to come to his office to sign the application, and they complied. (*Id.* at 85.) Mr. Azevedo signed,[4] and when he did so he agreed to the following statements:

> **This application is signed under the penalties of perjury.**
>
> Any person who knowingly provides false information in order to obtain insurance with the Company to whom this application is made commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties.
>
> **Applicant's Statement**
>
> I have read the above application and I declare that to the best of my knowledge and belief all of the foregoing statements are true and that these statements are offered as an inducement to the Company to issue the policy for which I am applying.

(Exh. A to Wigmore Aff., at 3.)

The Adam Miller agency transmitted the application to Danbury on March 16, 2006. (Aff. of Cheryl Wigmore, Vice President of Danbury, ¶ 7) (hereinafter "Wigmore Aff."). Danbury scanned the application into its "ImageRight" system and did not retain the original. (*Id.,* ¶ 9.) In reliance on the information contained in the application, Danbury issued a policy insuring the Azevedos' Monroe home for the period March 10, 2006 to March 10, 2007. (*Id.*, ¶ 11.) The Azevedos renewed the policy for the period March 10, 2007 to March 10, 2008. (*Id.,* ¶

---

[3]    It should be noted that some of Mr. Krasner's deposition testimony was taken subject to form-of-the-question objections by Attorney Costantini.

[4]    Although his signature is hard to read on the extant copies of the application, there is no dispute that he signed it. At his May, 2008 examination under oath, Mr. Azevedo testified that he "remembered signing some documents" in connection with the application; that he "sure [the application was] something that [he] signed when [he] purchased the insurance"; and that the signature on the application "look[ed] like" his. (Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 63 – 64.) Moreover, he did not deny signing it at any point before he passed away.

12.)  At the time, it was not Danbury's practice to ask a policyholder to fill out another application for a first renewal, and accordingly Danbury issued the 2007-2008 renewal policy in reliance on the information contained in the Azevedos' 2006 application.  (*Id.*, ¶ 13.)

The Azevedos' 2007-2008 renewal policy contained a "Misrepresentation, Concealment, or Fraud" provision.  More specifically, the policy provided that it "is void if, before or after a loss, any 'insured' has intentionally . . . concealed or misrepresented any material fact or circumstance . . . or made false statements . . . relating to this insurance or the subject thereof." (Exh. B to Wigmore Aff., at Bates page DIC00027.)

In 2007 the Azevedos' finances took a turn for the worse.  In September of 2007 they belatedly filed their tax return for the 2005 tax year, and they reported that Mr. Azevedo's wood flooring business lost $440,651.  (Tr. of Depo. of J. Azevedo, Exh. 1 to Farrish Aff., at 119 – 121.)  They also filed their tax return for the 2006 tax year, reporting that they owed $93,129 in taxes in that year alone.  (*Id.* at 124.)  They did not enclose a check with their 2006 return, however.  (*Id.* at 124-25.)  Although he filed and signed the return, Mr. Azevedo claimed that it was mistaken because a "whole, entire checkbook" worth of expenses was not reflected in it. (*Id.* at 124.)

On January 28, 2008, while Mr. Azevedo was being treated at Griffin Hospital for substance abuse (*id.* at 151),[5] a fire destroyed the Azevedos' Monroe home – and conveniently destroyed their tax records too.  (*Id.* at 125.)  The Azevedos placed a claim with Danbury. Danbury investigated the fire and concluded that it had been intentionally set.  (*See generally* Rept. of R. Corry, ECF No. 156-3.)

---

[5]    It should be noted that this deposition testimony was also taken subject to objections by Attorney Costantini.

Importantly for this motion, Danbury learned other things in its investigation as well. First, Danbury learned that there had indeed been a wood stove in the Azevedos' Monroe home at the time they took out their initial policy. (*E.g.,* Tr. of Exam. Under Oath of A. Azevedo, Exh. 6 to Farrish Aff., at 132; *see also* Exh. 7 to Farrish Aff. (photograph depicting wood stove in wreckage of home).) Second, Danbury learned that the Azevedos' oil heating system was supplied by an underground oil storage tank. (*E.g.,* Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 60.) Third, Danbury learned that the Azevedos had at least one dog at the time they filled out their application. (*E.g.,* Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 64 – 65.) Accordingly, when the Azevedos sued in June of 2008, Danbury asserted as an affirmative defense that the Azevedos had made material misrepresentations in the application process.

The parties have conducted extensive discovery and none of it has contradicted the picture that Danbury learned in its investigation: the Azevedos made at least three false statements of material fact in their application for insurance. Danbury is therefore entitled to summary judgment.

## III. Discussion

### A. *The Summary Judgment Standard*

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, "the court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party." *Stonington Water St. Assocs., LLC v. Hodess Bldg. Co.*, 792 F. Supp. 2d 253, 256 (D. Conn. 2011) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986)).  When the moving party carries its burden, however, "the nonmoving party may not rest upon the mere allegations or denials of its pleadings, but must present significant probative evidence to establish a genuine issue of material fact."  *Id. (citing Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).   In sum, "the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts."  *Basso v. Potter*, 596 F. Supp. 2d 324, 331 (D. Conn. 2009) (*citing Matsushita*, 475 U.S. at 586) (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* (*citing Anderson*, 477 U.S. at 249-50).

Summary judgment may be granted not only with respect to a plaintiff's claims, but also with respect to a defendant's affirmative defenses.   A "defendant may employ a summary judgment motion to assert a defense that entitles defendant to judgment as a matter of law." Wright, Miller & Kane, *Fed. Prac. & Proc.: Civil 3d* § 2734.  Such a motion "will be granted when it raises at least one legally sufficient defense that would bar plaintiff's claim and that involves no triable issue of fact."  *Id.* (*citing W. Haven Sch. Dist. v. Owens-Corning Fiberglas Corp.,* 721 F. Supp. 1547 (D. Conn. 1988)).

B.      *There Is No Issue of Material Fact to be Tried:  The Azevedos Obtained Their Insurance Policy Through Material Misrepresentation, and Their Material Misrepresentations Void the Policy*

An insurance policy is void when the policyholder obtains it by knowingly making a false statement of material fact.  "Material representations . . . relied on by the company, which were untrue and known by the assured to be untrue when made, invalidate the policy."  *State Bank & Trust Co. v. Conn. Gen. Life Ins. Co.,* 109 Conn. 67, 72, 145 A. 565 (1929).

The United States Court of Appeals for the Second Circuit has distilled the nearly century-old rule of *State Bank and Trust* into a three-part test.  *Pinette v. Assur. Co. of Am.*, 52 F.3d 407, 409 (2d Cir. 2005).  Under that test, an insurance policy is void when the insurer

demonstrates "(1) a misrepresentation (or untrue statement) by the plaintiff which was (2) knowingly made and (3) material to the defendant's decision whether to insure." *Id.*

There is no genuine dispute that all three elements of the *Pinette* test are satisfied in the Azevedos' case. The Azevedos made at least three untrue statements in their application. They confirmed at their examinations under oath – and again at their depositions – that they knew the three statements were false when they made them. Moreover, their false statements were material to Danbury's decision whether to issue the policy, both as a matter of law and in fact. Accordingly, Danbury is entitled to summary judgment.

### 1. The Azevedos Made Untrue Statements In Their Application

The Azevedos made at least three untrue statements in their insurance application, the first of which concerned their wood stove. The application asked the Azevedos to state whether their home had such a stove, and they answered "no." (Exh. A to Wigmore Aff., at 2.) After the fire, however, Danbury learned that this answer was false. (*See, e.g.,* Exh. A to Farrish Aff.) (photo produced by Azevedos' public adjuster, showing wood stove in fire debris). Mrs. Azevedo confirmed as much at her May 14, 2008 examination under oath:

Q. Okay. Do you have a wood stove?

A. Yes.

Q. When was that installed in the house? It came with the house?

A. Yes.

(Tr. of Exam. Under Oath of A. Azevedo, Exh. 6 to Farrish Aff., at 132.)

The Azevedos' second untrue statement concerned their oil heat. The application asked them to state whether the home had an outside oil tank, and they answered "no." (Exh. A to Wigmore Aff., at 2.) After the fire, Danbury learned that this answer was also false. At his deposition, Mr. Azevedo testified:

Q.      How was your home heated?  And I'm talking about the home at 62 Hunter Ridge.

A.      It was baseboard.

Q.      And what heated the water that went through the baseboards?

A.      What heated the water?

Q.      Yeah.  Was it oil, or was it gas?

A.      It was oil.

Q.      Okay.  Was the whole house heated by oil?

A.      Yes.

Q.      Where was the oil tank?

A.      Underground.

Q.      Was it always there?

A.      I believe so.

Q.      You didn't put it underground when you owned the house, correct?

A.      Correct. . . .

Q.      Okay.  Where on the property was the oil tank?

A.      It was underground in, I believe, the front of the house.

(Tr. of Depo. of J. Azevedo, Exh. 1 to Farrish Aff., at 65 – 66.)

The Azevedos' third untrue statement concerned their pets.  The application asked them to state whether they had pets, and they answered "no."  (Exh. A to Wigmore Aff., at 2.)  This statement was also untrue, and Mr. Azevedo admitted as much at his deposition:

Q.      Did you own any dogs at the time you bought the property?

A.      I had a Boxer.  One dog.

Q.      Okay.  And you owned that dog at the time you purchased the property; correct?

A.      Yes.

Q.     Okay.  Did you own that dog continuously through the time that you lived at Hunter Ridge Road?

A.     Yes.

(Tr. of Depo. of J. Azevedo, Exh. 1 to Farrish Aff., at 67.)  In short, the Azevedos admitted that their application contained at least three untrue statements.  Consequently there is no genuine factual issue to be tried with respect to the "misrepresentation" prong of the *Pinette* test.

### 2.     The Azevedos Made Their Untrue Statements Knowingly

There is similarly no issue to be tried with respect to the second prong of the test – that the misrepresentation be "knowingly made."  For a false statement to be "knowingly made," all that is required is that the applicant be aware of its falsity.  *Pinette*, 52 F.3d at 409 ("For a material misrepresentation to render a contract voidable under Connecticut law, the misrepresenting party must know that he is making a false statement.").  The insurer need not plead or prove that the applicant made the false statement with a conscious design to defraud.  *State Bank & Trust*, 109 Conn. at 72 ("Material misrepresentations . . . relied on by the company, which were untrue and known by the assured to be untrue when made, invalidate the policy without further proof of actual conscious design to defraud."); *see also Paul Revere Life Ins. Co. v. Pastena*, 52 Conn. App. 318, 323, 725 A.2d 996 (1999).  Put differently, "an insured makes a knowing misrepresentation when he submits an answer other than that which he has reason to believe is true."  *Mt. Airy Ins. Co. v. Millstein,* 928 F. Supp. 171, 175 (D. Conn. 1996).

When the Azevedos submitted an insurance application claiming that they had no wood stove, they knew they were not telling the truth.  Mr. Azevedo admitted as much at his examination under oath:

Q.     Sir, I'm just going to show you the second page [of the application], which is underwriting information, okay?  And just have you briefly read through those, and tell me whether or not the information is correct . . . .  Sir, there's one here, supplemental heat, indicates wood stove.  What's the answer to that, sir?

A.    No.

Q.    All right.  Was that correct on the date of the application, that there was no wood stove in the home?

A.    That's incorrect.

(Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 65.)  Similarly, Mrs. Azevedo testified at her examination under oath that the "wood stove . . . came with the house."  (Tr. of Exam. Under Oath of A. Azevedo, Exh. 6 to Farrish Aff., at 132.)

The Azevedos also knew they were not telling the truth when they claimed to have no outside oil tank.  Mr. Azevedo testified at his examination under oath that he knew about the underground oil tank at the time he purchased the home:

Q.    Sir, were you aware of whether there was an oil tank at the property?

A.    If I was aware?

Q.    That there was an underground, inground oil tank on the property?

A.    Yes.

Q.    All right.  How – when did you become aware of that?

A.    After – I mean, when I purchased the house.

Q.    All right, so you knew when you purchased the house that there was an oil tank in the ground?

A.    I believe so.

(Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 60.)   He confirmed this testimony at his subsequent deposition.  (Tr. of Depo. of J. Azevedo, Exh. 1 to Farrish Aff., at 66) (Q.  "Did you know that the house had an underground oil tank when you bought it?"  A.  "I believe so.").

Additionally, the Azevedos knew they were not telling the truth when they claimed to have no pets.  At his examination under oath, Mr. Azevedo admitted that the claim was false:

-11-

Q.  At the time of this application, sir, did you own any dogs?

A.  Yes.

Q.  How many dogs did you own at the time of that, purchasing this home and applying for this insurance?

A.  Either one or two.

(Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 64 - 65.)  He confirmed this testimony at his deposition as well.  (Tr. of Depo. of J. Azevedo, Exh. 1 to Farrish Aff., at 67) (Q.  "And you owned that dog at the time you purchased the property; correct?"  A.  "Yes.").  In sum, the Azevedos admitted that they made their misrepresentations knowingly.  Consequently there is no genuine issue to be tried with respect to the second prong of the *Pinette* test.

### 3. The Azevedos' Untrue Statements Were Material to Danbury's Decision to Insure

The third element of the *Pinette* test is satisfied when the misrepresentation was material to the insurer's decision to issue the policy.  "Under Connecticut law, a misrepresentation is material when, in the judgment of reasonably careful and intelligent persons, it would so increase the degree or character of the risk of the insurance as to substantially influence its issuance, or substantially affect the rate of premium."  *Pinette,* 52 F.3d at 411 (*quoting Davis Scofield Co. v. Agricultural Ins. Co.,* 109 Conn. 673, 678, 145 A.38 (1929)).  Moreover, since insurance companies do not typically ask application questions unless the answer would affect their decision on whether to issue the policy, false answers to application questions are almost always material as a matter of law.  "Connecticut case law strongly suggests that an answer to a question on an insurance application is presumptively material."  *Id.* (*citing State Bank and Trust*, 109 Conn. at 70).  In cases where the insurer "specifically requested" a truthful answer to a particular question, a false response "supports [a] finding of materiality."  *Id.*  And in the limited instances in which courts have looked past the presumption of materiality and examined whether the

misrepresentation was in fact material to the underwriter's decision to insure, those courts have not hesitated to grant summary judgment to the insurer when the underwriter testifies without contradiction that she would not have issued the policy if she had been told the truth. *See, e.g., Ranger Ins. Co.*, 63 F. Supp. 2d at 186.

In this case, the three questions to which the Azevedos gave inarguably false answers were application questions – and, therefore, were presumptively material. Moreover, the Azevedos cannot overcome the presumption of materiality, because the evidence confirms that the three untruthful answers were indeed crucial to Danbury's consideration of the Azevedos' application. As Danbury's Vice President, Cheryl Wigmore, explains in her affidavit, Danbury "consider[s] the presence or absence of a wood stove in deciding whether to issue a homeowners insurance policy on a particular home" because "homes with wood stoves present fire and other risks that homes without wood stoves do not." (Wigmore Aff. at ¶ 15.) Similarly, Danbury considers the presence or absence of an outside oil tank "[b]ecause homes with outside oil tanks present pollution and other risks that homes without outside oil tanks do not." (*Id.,* ¶ 16.) Danbury also considers whether the applicant owns dogs, because dogs of course present liability risks. (*Id.,* ¶ 17.) As Ms. Wigmore further explains, when a home presents *all three* risks – in other words, when it has a wood stove, an outside oil tank, and a dog – it is flatly unacceptable:

> I can state unequivocally that if Danbury had known, before March 10, 2007, that the property located at 62 Hunter Ridge Road in Monroe Connecticut (a) had a wood stove; (b) had an outside oil tank; and (c) had one or more dogs, it would not have issued the Renewal Policy.

(*Id.,* ¶ 19.) Indeed, Danbury would have rejected the Azevedos' application on account of the outside oil tank alone. (*Id.,* ¶¶ 20-24.)

To summarize, the uncontradicted evidence establishes that Danbury would not have issued the Azevedos' policy if they had told the truth on their application. By extension,

Danbury would not have been the Azevedos' insurer when their house burned down. The Azevedos' misrepresentations are therefore material, and the third and final prong of the *Pinette* test is consequently satisfied.

### 4. All of the Azevedos' Anticipated Defenses Lack Merit

The Azevedos have signaled that they will attempt three defenses to the charge of a knowing, material misrepresentation. First, they evidently plan to claim that although Mr. Azevedo signed the application, the entries were made by an agent and not read by Mr. Azevedo before he signed – thus, in their view, demonstrating that he was unaware of their falsity.[6] Second, they apparently plan to argue that at least one of the application questions was ambiguous. Third, they can be expected to argue that they can avoid summary judgment on account of perceived evidentiary problems with the application. Each of these arguments fails as a matter of law.

The first argument – that an applicant defeats a charge of a "knowing misrepresentation" when he claims not to have read the application – was squarely rejected as a matter of law by the Second Circuit in *Pinette.* In that case, the homeowner signed an application in which he falsely claimed to have had no prior loss history. 52 F.3d at 409. The insurer did not initially discover the falsity of the claim, and it issued a policy to him. *Id.* When his house was later destroyed by fire, the insurer discovered the misrepresentation and declined to pay his fire loss. *Id.* He filed suit, and Judge Covello granted summary judgment to the insurer on account of the application

---

[6] In signing the application Mr. Azevedo agreed, among other things, that he had "read the above application" and "declare[d] that to the best of [his] knowledge and belief all of the foregoing statements are true and that these statements are offered as an inducement to the Company to issue the policy for which [he was then] applying." (Exh. A to Wigmore Aff., at 3.) It would therefore seem too late for him to claim that he did not read the full application. Nevertheless, at his examination under oath he claimed not to remember seeing the first two pages. (Tr. of Exam. Under Oath of J. Azevedo, Exh. 3 to Farrish Aff., at 64.)

misrepresentation. *Id.* at 408. On appeal, the homeowner claimed that Judge Covello erred in holding that the misrepresentation was made "knowingly." *Id.* at 410. More specifically, the homeowner claimed to have told the agent about his prior losses; that the agent "filled in the incorrect information on his own"; and that the homeowner "failed to detect the error because he neglected to read the application before signing it." *Id.* The Court of Appeals rejected the argument and affirmed the grant of summary judgment for the insurer. "Under Connecticut law . . . a person may not claim that a misrepresentation is 'innocent' solely because the person failed to read the application before signing it." *Id.* Indeed, Connecticut law "requires that the insured shall not only, in good faith, answer all the interrogatories correctly, but shall use reasonable diligence to see that the answers are correctly written." *Id.* (*citing Ryan v. World Mut. Life Ins. Co.,* 41 Conn. 168 (1874)). Stated differently, "an applicant for insurance has the affirmative duty to inform himself of the content of the application signed by him, under penalty of being bound by the representations as recorded therein." *Id.* (*citing* 7 George J. Couch, Cyclopedia of Insurance Law § 35:231, at 358 (2d ed. 1985)).

Like the homeowner in *Pinette*, the Azevedos cannot avoid summary judgment by claiming not to have read their insurance application. This is particularly true when one considers the statement to which Mr. Azevedo agreed when he signed the application: that he had "read the above application," and that "all of the foregoing statements are true." (Exh. A to Wigmore Aff., at 3.) Thus, even if Mr. Azevedo had been previously unaware of his duty to "inform himself of the content of the application signed by him," the statement put him on notice of it.

The Azevedos' second anticipated argument – that the application was "ambiguous" – similarly fails as a matter of law. The Azevedos evidently contend that their wood stove was not

actually a wood stove, but rather a "fireplace insert,"[7] and they apparently plan to argue that an application that asks about "wood stove[s]" does not squarely ask about "fireplace inserts." This claim lacks merit on at least two grounds. First, it improperly asks the Court to "torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Danbury Ins. Co. v. Ginnetti*, 2004 U.S. Dist. LEXIS 17857, at *5 (*quoting Goldberg v. Hartford Fire Ins. Co.*, 269 Conn. 550, 559, 849 A.2d 368 (2004)). In *Ginnetti* the applicant asked the Court to accept that an application question inquiring about "animals or exotic pets" could be read not to inquire about dogs, but the Court rejected the argument as a matter of law because no "reasonable applicant could think" that the question was so limited. The same is true of the application question in which Danbury asked the Azevedos about "wood stove[s]": no reasonable applicant could think that the question did not inquire about the Azevedos' appliance, irrespective of what they have opportunistically chosen to call it. Second, even if one were to suspend disbelief and treat the "wood stove" question as ambiguous, that does not defeat Danbury's misrepresentation claim. The Azevedos' statements about their oil tank and their pets would still be just as false. As noted above and in Ms. Wigmore's affidavit, Danbury simply did not issue insurance policies on properties with underground oil tanks, and accordingly the oil tank misrepresentation alone is sufficient to invalidate the policy. (Wigmore Aff. at ¶¶ 20-24.)

The Azevedos' third anticipated argument – that they can avoid summary judgment on account of perceived evidentiary problems with the application – is equally unmeritorious. The Azevedos apparently contend that Danbury cannot prove that the application contained

---

[7]     The Court may recall seeing, in the context of an earlier motion, a document in which Attorney Costantini marked up the damage estimate authored by the Azevedos' purported expert witness and public adjuster, Richard Ouellette. (Exh. G to Danbury's First Mot. to Disqualify, ECF No. 163-7.) In that document, Mr. Ouellette had called the wood stove a wood stove, just as the Azevedos had done at their examinations under oath. (*See id.* at 5.) Attorney Costantini wrote: "I don't like this name! Wasn't this an insert to a fireplace?" (*Id.*)

misrepresentations unless it can produce the original application with Mr. Azevedo's original signature. This is not the rule, however. Federal Rule of Evidence 1003 provides that duplicate documents are "admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." There is no such question in this case, as evidenced by the fact that the agent's and Danbury's copies of the application are essentially identical. (*Compare* Exh. 4 to Farrish Aff. (agent's copy) *with* Exh. A to Wigmore Aff. (Danbury's copy).) Moreover, Federal Rule of Evidence 1004 provides that "[a]n original is not required and other evidence of the content of a writing . . . is admissible if . . . all the originals are lost or destroyed, and not by the proponent acting in bad faith." As Ms. Wigmore explains in her affidavit, it was Danbury's practice to scan original applications into its "ImageRight" system and destroy them shortly afterward. (Wigmore Aff. at ¶¶ 7-11.) Danbury's scanned copy is therefore plainly admissible under Rules 1003 and 1004.

In sum, each of the Azevedos' challenges to the "misrepresentation" and "knowing" prongs of the *Pinette* test fail. Danbury is therefore entitled to summary judgment on its misrepresentation defense. Moreover, since the effect of the misrepresentation defense is to void the policy *ab initio,* Danbury is entitled to a corresponding dismissal of the contract breach counts in the Azevedos' Fourth Amended Complaint – because if there is no contract, then no contract could have been breached.

> C. *Danbury's Misrepresentation Defense Disposes Not Only of the Azevedos' Contract Breach Claims, but Also of Their "Bad Faith" and CUTPA/CUIPA Claims*

Insurance claimants often plead their complaints in three counts – a first count claiming breach of the insurance contract; a second count alleging "bad faith," or breach of the covenant of good faith and fair dealing; and a third count claiming a breach of the Connecticut Unfair Trade Practices Act or the Connecticut Unfair Insurance Practices Act. (*See, e.g.,* Fourth Am.

Compl., ECF No. 104; *see also Royal Indem. Co. v. King,* 532 F. Supp. 2d 404 (D. Conn. 2008).)

When a court dismisses the contract breach count, it is presented with the question of whether the "bad faith" and CUTPA/CUIPA claims can survive the dismissal. *See, e.g., Royal Indem. Co.*, 532 F. Supp. at 409.

Danbury submits that the dismissal of a policyholder's contract claim necessarily entails the dismissal of his or her "bad faith" and CUTPA/CUIPA claims. A "bad faith" claim, after all, is a claim that the insurer tortiously "impede[d] the plaintiff's right to receive benefits that he or she *reasonably expected to receive under the contract*," *Renaissance Mgmt. Co. v. Conn. Hous. Fin. Auth.,* 281 Conn. 227, 240, 915 A.2d 290 (2007) (emphasis added), and it would therefore seem that a "bad faith" claim cannot exist when the insurer did not deprive the policyholder of any benefit he or she was owed under the contract. Moreover, "bad faith" and CUTPA/CUIPA claims both require that the insurer's conduct be the proximate cause of some sort of harm to the plaintiff, and where the insurer is held not to have deprived the plaintiff of the benefit of his bargain, the requirement of harm is not met. *Royal Indem. Co.,* 532 F. Supp. 2d at 415. In Danbury's view, contrary cases are wrongly decided. *E.g., United Techs. Corp. v. Am. Home Assur. Co.,* 118 F. Supp. 2d 181 (D. Conn. 2000).

In this case, however, the Court need not decide the abstract question of whether there is a tort of "procedural bad faith" – because even if the tort exists, the Azevedos cannot invoke it. One consequence of the Azevedos' material misrepresentations is that their policy is void *ab initio* and they are therefore *not entitled to be treated as a Danbury policyholder.* Cases positing the existence of "procedural bad faith" locate the tort's source in the parties' contractual relationship; they reason that an insurance policyholder is entitled to good faith treatment even on an uncovered claim *by virtue of her status as a policyholder. See, e.g., United Techs. Corp.,*

181 F. Supp. 2d at 188. Those cases cannot be employed to create a tort of "procedural bad faith" in favor of a person who was never entitled to policyholder status in the first place. *"The existence of a contract between the parties is a necessary antecedent to any claim of breach of the duty of good faith and fair dealing."* *Carford,* 94 Conn. App. at 45 (emphasis in original). Accordingly, "no claim of breach of the duty of good faith and fair dealing will lie for conduct that is outside of a contractual relationship." *Id.* at 46. The "right to assert a private cause of action for CUIPA violations through CUTPA" also does not apply outside of such a relationship. *Id.* at 53. Put simply, the Azevedos must be treated as if they were never Danbury policyholders – and once they are treated that way, their "bad faith" and CUTPA/CUIPA claims fail as a matter of law.

The Azevedos' "bad faith" and CUTPA/CUIPA claims also fail for the same reasons that the policyholder's claims failed in *Royal Indemnity*. In that case, the policyholder alleged that Royal breached its contract by wrongfully failing to defend and indemnify them from a third-party liability claim. 532 F. Supp. 2d at 407. They also alleged "bad faith" and CUTPA/CUIPA violations arising out of essentially the same alleged failures. *Id.* at 411-12, 415. The Court held that Royal's unwillingness to defend or indemnify the claim was not wrongful – and, by extrapolation, that the policyholders were not deprived of any benefit owed to them under the insurance contract. *Id.* at 415. Although the Court did not decide the abstract question of whether the tort of "bad faith" could be committed in the context of an uncovered claim, it held that the policyholder had not pled such a claim against Royal, in part because they had not pled any claim of harm that survived the dismissal of their contract breach claim. *Id.* at 413, 415. The same is true in this case. The Azevedos allege a laundry list of wrongs that Danbury supposedly committed (Fourth Am. Compl., ECF No. 104, at 6 – 9), but all of those wrongs

relate to Danbury's alleged duties with respect to the handling of a claim under an insurance policy – duties which necessarily do not exist once the policy is adjudged never to have existed. In other words, once one acknowledges that the Azevedos are not policyholders of Danbury, their "bad faith" and CUTPA/CUIPA counts lack any cognizable claim of harm. Those claims should be dismissed accordingly.

## IV.  Conclusion

For the foregoing reasons, Danbury respectfully requests that the Court enter an order (a) granting summary judgment in Danbury's favor on its third affirmative defense and (b) dismissing all of the claims in the plaintiffs' fourth amended complaint.

Respectfully submitted,

DEFENDANT AND CROSSCLAIM
PLAINTIFF, DANBURY INSURANCE
COMPANY,

By:    /s/ Thomas O. Farrish
       Paul D. Williams (ct05244)
       *pdwilliams@daypitney.com*
       Joseph K. Scully (ct26541)
       *jkscully@daypitney.com*
       Thomas O. Farrish (ct26917)
       *tofarrish@daypitney.com*
       Day Pitney LLP
       242 Trumbull St.
       Hartford, Connecticut  06103-1212
       (860) 275-0100 (tel.)
       (860) 275-0343 (fax)

       Its Attorneys

## CERTIFICATION OF SERVICE

This is to certify that on this 5th day of October, 2012, a copy of the foregoing Memorandum of Law In Support Of Danbury Insurance Company's Motion for Summary Judgment was filed electronically and served by mail upon anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


             /s/ Thomas O. Farrish
              Thomas O. Farrish